The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 6, 2025

## 2025COA15

**No. 23CA1927, *People v. Morris* — Crimes — Stalking; Constitutional Law — First Amendment — Freedom of Speech**

In *Counterman v. Colorado*, 600 U.S. 66 (2023), the United States Supreme Court held that courts must consider a defendant's First Amendment right of free speech in prosecutions premised on the utterance of threatening statements under Colorado's stalking statute, section 18-3-602(1)(c), C.R.S. 2024. In this case, a division of the court of appeals considers whether the Supreme Court's *Counterman* analysis applies to stalking prosecutions premised on the defendant's *actions* rather than on the defendant's *threats*. The division holds that a stalking prosecution premised on acts constituting approaching or contacting the victim does not implicate the First Amendment because it is not premised on the content of the defendant's speech.

COLORADO COURT OF APPEALS     **2025COA15**

Court of Appeals No. 23CA1927
Mesa County District Court No. 22CR955
Honorable Brian J. Flynn, Judge

The People of the State of Colorado,

Plaintiff-Appellant,

v.

Daniel Corey Morris,

Defendant-Appellee.

RULING DISAPPROVED

Division I
Opinion by JUDGE LIPINSKY
Sullivan and Taubman*, JJ., concur

Announced February 6, 2025

Daniel P. Rubinstein, District Attorney, Susan Manown, Deputy District
Attorney, Grand Junction, Colorado, for Plaintiff-Appellant

No Appearance for Defendant-Appellee

Philip J. Weiser, Attorney General, Jillian J. Price, Deputy Attorney General,
Lane Towery, Assistant Attorney General Fellow, Denver, Colorado, for Amici
Curiae Colorado Attorney General's Office and Colorado District Attorney's
Council

Megan A. Ring, Colorado State Public Defender, Mackenzie R. Shields, Deputy
State Public Defender, Denver, Colorado, for Amicus Curiae Office of the State
Public Defender

The Noble Law Firm LLC, Heidi Tripp, Lakewood, Colorado, for Amicus Curiae
Colorado Criminal Defense Bar

Lindy Frolich, Alternate Defense Counsel, Denver, Colorado, for Amicus Curiae Office of the Alternate Defense Counsel

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1      In *Counterman v. Colorado*, 600 U.S. 66 (2023), the United States Supreme Court held that courts must consider a defendant's First Amendment right of free speech in prosecutions premised on the utterance of threatening statements under Colorado's stalking statute, section 18-3-602(1)(c), C.R.S. 2024.  To ensure that the defendant's speech is accorded sufficient protection, the Court held that a defendant can be convicted for making threats only if the defendant acted recklessly — in other words, if the defendant "consciously disregard[ed] a substantial [and unjustifiable] risk that [his] conduct will cause harm to another."  *Counterman*, 600 U.S. at 78-80 (quoting *Voisine v. United States*, 579 U.S. 686, 691 (2016)).

¶ 2      Thus, a conviction for violating the stalking statute by making "true threats" cannot stand unless the defendant was "aware 'that others could regard his statements as' threatening violence and [the defendant] 'deliver[ed] them anyway."  *Id.* at 79 (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)).  The Court thus vacated the decision of a division of this court and remanded for review of Counterman's conviction under a recklessness standard.  *Id.* at 82-83.

¶ 3    In this case, we consider whether the Supreme Court's *Counterman* analysis applies to stalking prosecutions premised on the defendant's *actions* — specifically, following the victim to her place of work or home and repeatedly attempting to get her attention after she told the defendant to leave her alone — rather than on the defendant's *threats*.

¶ 4    Out of concern that the stalking charge against defendant Daniel Corey Morris could implicate speech protected by the First Amendment, as discussed in *Counterman*, the trial court deleted the reference to "communication" from the elemental stalking jury instruction (the stalking instruction) and then partially granted Morris's motion for a judgment of acquittal over the prosecutor's objection. Specifically, the court granted the motion as to the part of the charge arising from Morris's repeated contacts with the victim. In addition, the court limited the jury's consideration of the possible acts that could constitute the charged offense to whether Morris repeatedly approached the victim. The jury acquitted Morris.

¶ 5    The People appeal the court's decision to restrict the jury's consideration to whether Morris repeatedly approached the victim

2

in a manner that would cause a reasonable person to suffer serious emotional distress and whether he caused the victim serious emotional distress. They do not appeal the court's revisions to the stalking instruction. In this appeal, the People assert that, because the conduct for which Morris was tried did not implicate the content of his speech, the court erroneously applied the Supreme Court's *Counterman* analysis. Our jurisdiction to consider the People's appeal derives from section 16-12-102(1), C.R.S. 2024.

¶ 6      Because Morris did not file a brief, we solicited amicus briefs. We received an amicus brief from the Colorado Attorney General's Office and the Colorado District Attorney's Council. We received a second amicus brief from the Colorado State Public Defender, Colorado Criminal Defense Bar, and Alternate Defense Counsel.

¶ 7      We agree with the People and disapprove of the court's ruling. We hold that a stalking prosecution premised on acts constituting approaching or contacting the victim does not implicate the First Amendment because it is not premised on the content of the defendant's speech or expressive conduct.

## I. Background and Procedural History

¶ 8    Morris and the victim were in an intimate relationship and at one time lived together. After their relationship ended and Morris moved out of the victim's home, Morris and the victim remained friends.

¶ 9    Several months later, the victim told Morris to leave her alone and to stop communicating with her. Morris, however, continued to contact the victim in person and through text messages and phone calls and used someone else's phone to call her after she blocked his phone number.

¶ 10    Morris was charged with stalking in violation of section 18-3-602(1)(c). The charging document alleged that Morris repeatedly "followed, approached, contacted, placed under surveillance, or made any form of communication with [the victim], in a manner that would cause a reasonable person to suffer serious emotional distress, and caused [the victim] serious emotional distress."

¶ 11    At trial, the victim testified that she saw Morris drive his truck into the driveway of the studio where she worked as a glass artist. Upon seeing Morris, she turned off her equipment, locked the

doors, and hid in the bathroom. Morris began aggressively banging on the front door. He yelled at her to talk to him, uttering short phrases such as "Will you talk to me?" "Can we talk?" and "Can I get my passcode back?" The banging stopped after about four or five minutes. Thinking Morris had left, the victim started to go back to her studio but stopped and retreated to the bathroom when Morris resumed banging on the door and yelling at her.

¶ 12 After the banging stopped a second time, she looked outside. When she did not see Morris's truck, she returned to her workspace, which faced a window. Morris, however, was apparently hiding beneath the windowsill immediately in front of the victim's workspace and startled her by appearing in the window while she was at her desk. He repeatedly asked her to talk to him. She told him multiple times to go away and that he needed to leave.

¶ 13 After Morris finally left, the victim went home and called the police to report Morris's behavior. Before the police could contact Morris, however, he showed up at the victim's home and knocked loudly on her door and yelled at her to talk to him. Although Morris did not utter threatening words, the victim said his behavior frightened her.

¶ 14     At the conclusion of the prosecution's case, Morris moved for a judgment of acquittal, arguing that the prosecution had not presented any evidence that he "consciously disregarded a substantial risk that his words to [the victim] would cause a reasonable person to suffer serious emotional distress." In response, the prosecutor asserted that the case involved not just communications, but also Morris's actions of approaching and contacting the victim. The prosecutor emphasized that, unlike *Counterman*, the case against Morris was not premised on "true threats" because the victim testified "she was not threatened."

¶ 15     The court initially agreed with the prosecutor and denied Morris's motion for judgment of acquittal. But the court deleted the reference to "communication" in the stalking instruction, "given the *Counterman* case," based on the court's concern that the charge against Morris implicated protected speech as well as conduct. A few minutes later, however, the court reconsidered its ruling, explaining that it believed Morris's statements to the victim were protected speech. The prosecutor objected and argued that Morris's contact with the victim did not involve protected speech and that the evidence of contact was Morris approaching her studio and her

home, banging on the door, yelling at her (regardless of what he was yelling), and popping up at her window.

¶ 16    The court disagreed.  The court noted that the evidence regarding the contact part of the charge involved Morris saying things to the victim like, "Will you talk to me?"  The court found that such statements constituted protected speech under *Counterman.*

¶ 17    Accordingly, the court granted Morris a judgment of acquittal on the contact portion of the charge.  The court found that, "given the evidence in this case with regard to their [sic] being contact by way of speech," even when viewing the evidence in the light most favorable to the prosecution, there was "insufficient evidence to show that [Morris] would have recklessly made such statements that would cause a reasonable person to suffer serious emotional distress."  The court found, however, that *Counterman* did not apply to the approach part of the charge because it did not rely on any speech.

¶ 18    Thus, the court limited the jury's consideration of the stalking charge to whether Morris knowingly and repeatedly approached the victim in a manner that would cause a reasonable person to suffer

serious emotional distress.  The jury found Morris not guilty of that charge.

## II.    Analysis

¶ 19    The People appeal the court's decision to grant Morris's motion for judgment of acquittal but not the court's deletion of the reference to "communication" from the stalking instruction or the court's finding there was insufficient evidence to establish that Morris recklessly made statements that would cause a reasonable person to suffer serious emotional distress.  Thus, our analysis focuses on whether the court erred by granting Morris's motion for judgment of acquittal.

### A.    Standard of Review

¶ 20    We review de novo the constitutionality of a statute as applied to an individual.  *People v. Chase*, 2013 COA 27, ¶ 65, 411 P.3d 740, 754.  We likewise review a district court's interpretation of case law and statutes de novo.  *Whiteaker v. People*, 2024 CO 25, ¶ 9, 547 P.3d 1122, 1125; *People v. Rieger*, 2019 COA 14, ¶ 8, 436 P.3d 610, 612.

¶ 21    "In construing a statute, our primary purpose is to ascertain and give effect to the legislature's intent."  *McCoy v. People*, 2019

CO 44, ¶ 37, 442 P.3d 379, 389. "To do so, we look first to the language of the statute, giving its words and phrases their plain and ordinary meanings." *Id.* We read and consider the statutory scheme as a whole and strive "to give consistent, harmonious, and sensible effect to all its parts." *People v. Apodaca*, 58 P.3d 1126, 1130 (Colo. App. 2002).

### B. The Stalking Statute and *Counterman*

¶ 22 A person commits the offense of stalking by "[r]epeatedly follow[ing], approach[ing], contact[ing], plac[ing] under surveillance, or mak[ing] any form of communication with another person . . . in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress." § 18-3-602(1)(c).

¶ 23 Counterman was charged with stalking after he sent the victim numerous Facebook messages, in textual and photographic form, over a two-year period. *People v. Counterman*, 2021 COA 97, ¶¶ 11, 16, 497 P.3d 1039, 1043-44, *vacated*, 600 U.S. 66 (2023). When the victim blocked Counterman's communications, he created new accounts and resumed sending messages. *Id.* at ¶ 6, 497 P.3d at 1043. Some of the communications indicated that Counterman

9

had been surveilling the victim and, in at least one message, Counterman said he wanted the victim to die. *Id.* at ¶ 7, 497 P.3d at 1043. Counterman was convicted as charged with of one count of stalking (severe emotional distress) in violation of section 18-3-602(1)(c). *Id.* at ¶¶ 12-13, 497 P.3d at 1043-44.

¶ 24 In Counterman's appeal in this court, the division applied an objective test to conclude that Counterman's repeated electronic messages were "true threats" and thus unprotected speech under the First Amendment of the United States and article II, section 10, of the Colorado Constitution. *Id.* at ¶¶ 29-30, 53, 497 P.3d at 1046, 1049. Although the Colorado Supreme Court denied Counterman's petition for a writ of certiorari, *Counterman v. People*, (Colo. No. 21SC650, Apr. 11, 2022) (unpublished order), the United States Supreme Court granted certiorari to decide "(1) whether the First Amendment requires proof of a defendant's subjective mindset in true-threats cases, and (2) if so, what *mens rea* standard is sufficient." *Counterman*, 600 U.S. at 72.

¶ 25 The Supreme Court began its analysis in *Counterman* by acknowledging that not all types of communications receive First Amendment protection, specifically recognizing that "[t]rue threats

of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id.* The Court then considered when a communication is a "true threat" for which a defendant can be convicted without infringing on the defendant's First Amendment rights.

¶ 26 The Court noted that the determination of whether a defendant can be convicted for making a "true threat" under the stalking statute depends not on the defendant's mental state, but on what the statement conveys to the recipient of the communication. *Id.* The Court explained that, while the First Amendment generally protects a person's ability to speak freely, true threats of violence are outside the bounds of First Amendment protection. *Id.* at 69. But the Court's analysis did not stop here. The Court said that "the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability. The reason relates to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Id.* at 75.

¶ 27 The Court concluded that, consistent with the First Amendment's protections for speech, a person cannot be criminally

convicted for making a threat absent proof that the defendant had some subjective understanding of the threatening nature of the defendant's statement. *Id.* at 76-78. The Court held that a recklessness standard — a showing that a person consciously disregards a substantial and unjustifiable risk that the defendant's conduct will cause harm to another — is the minimum mens rea to support a prosecution premised on the utterance of a threat. *Id.* at 79-82. Thus, in a prosecution under section 18-3-602(1)(c) for stalking based on a communication, the Court held that the First Amendment requires the prosecution to prove that the defendant (1) had some subjective understanding of the threatening nature of the defendant's statements and (2) recklessly made such statements by consciously disregarding a substantial risk that the communications would be viewed as threatening violence. *Counterman,* 600 U.S. at 78, 80-82.

¶ 28    In *Counterman,* the Court cited its jurisprudence protecting conduct that communicates a message, as well as its decisions articulating the limited categories of conduct that, while expressive, receive no First Amendment protection. *Compare, e.g., Texas v. Johnson,* 491 U.S. 397, 420 (1989) (holding that the act of burning

12

an American flag is protected expressive conduct), *and Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969) (holding that the First Amendment protects expressive conduct in the form of wearing black armbands to protest the United States' involvement in the Vietnam war), *and Brown v. Louisiana*, 383 U.S. 131, 133, 141-42 (1966) (holding that Black protesters' sit-in in a "whites only" area to protest segregation is protected under the First and Fourteenth Amendments' guarantees of freedom of speech and assembly and the freedom to petition the government for a redress of grievances), *with Counterman*, 600 U.S. at 73-74 (noting the "few limited areas" in which the First Amendment "permit[s] restrictions upon the content of speech," such as "incitement — statements 'directed [at] producing imminent lawless action,' and likely to do so"; "defamation — false statements of fact harming another's reputation"; and "obscenity — valueless material 'appeal[ing] to the prurient interest' and describing 'sexual conduct' in 'a patently offensive way'" (first quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010); then quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); and then quoting *Miller v. California*, 413 U.S. 15, 24 (1973))). These cases teach that any attempt to draw a

bright line between conduct or speech — whether in the context of Colorado's stalking statute or elsewhere — is a perilous task and that we must closely scrutinize whether a statute seeks to criminalize expressive conduct.

### C. The Court's Decision to Grant Morris's Motion for Judgment of Acquittal

¶ 29     In applying *Counterman* to Morris's actions, the court noted that any communication that is not a "true threat" is protected speech under the First Amendment.  Thus, the court reasoned that knocking on a door while asking to speak to another person is protected speech to which the recklessness mens rea standard discussed in *Counterman* applies.  Consequently, the court concluded there was insufficient evidence to allow the jury to consider whether Morris's contact with the victim violated the stalking statute because (1) Morris's statements that the victim described were not "true threats," and (2) the People had not provided any evidence that Morris consciously disregarded a substantial and unjustifiable risk that his conduct would cause the victim harm.

14

### D. The Court Erred by Dismissing the Contact Part of the Stalking Charge

¶ 30 We begin by reiterating that *Counterman* applies to speech-based stalking prosecutions. *Counterman* concerned a stalking charge premised on repeated communications that implicated speech protected by the First Amendment and did not address any of the other forms of stalking under section 18-3-602(1)(c). Thus, the Court's articulation of a subjective standard for determining whether an actor had some understanding of the threatening nature of the actor's statements, yet nevertheless consciously disregarded a substantial and unjustifiable risk that the conduct would cause harm to another, applies only in the context of a stalking conviction premised on the content of a communication or expressive conduct. *See State v. Labbe*, 2024 ME 15, ¶ 49, 314 A.3d 162, 178-79 (noting that *Counterman* narrowly framed the issue as to whether the First Amendment required the State to prove a defendant's subjective mens rea in a true threats case where the content of the defendant's speech was the central focus of the inquiry).

¶ 31     As explained above, the crime of stalking can be accomplished when an actor "[r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication" with another person, when such action would cause a reasonable person to suffer serious emotional distress and does cause that person to suffer serious emotional distress. § 18-3-602(1)(c).  By listing alternative ways to commit the offense and connecting those methods by using the disjunctive conjunction "or," the General Assembly intended each of those methods to describe a different way to commit the offense.  *Friend v. People*, 2018 CO 90, ¶ 16, 429 P.3d 1191, 1195 (noting that, when the General Assembly joins "alternatives disjunctively in a single provision of the criminal code," it intended to "describe alternate ways of committing a single crime rather than to create separate offenses" (quoting *People v. Abiodun*, 111 P.3d 462, 467 (Colo. 2005))); *see Armintrout v. People*, 864 P.2d 576, 581 (Colo. 1993) ("[W]hen the word 'or' is used in a statute, it is presumed to be used in the disjunctive sense, unless legislative intent is clearly to the contrary.").

¶ 32     As Justice Sotomayor recognized in her partial concurrence in *Counterman,* a prosecution for stalking causing serious emotional

16

distress that is based on repeated unwanted contact does not depend on the content of the communication and, thus, raises fewer First Amendment concerns than does a prosecution premised on the content of the defendant's communications. *Counterman,* 600 U.S. at 85-86 (Sotomayor, J., concurring in part). Although such conduct may be accompanied by utterances, a defendant's "repeated unwanted contact[s]," *id.,* are not necessarily "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," *Spence v. Washington,* 418 U.S. 405, 409 (1974).

¶ 33    Thus, because stalking that causes serious emotional distress in violation of section 18-3-602(1)(c) does not always require proof that the accused engaged in the type of communication or expressive conduct that implicates the First Amendment, we conclude that *Counterman* does not apply to stalking prosecutions not premised on the content of the defendant's communication or expression. *See Labbe,* ¶ 50, 314 A.3d at 179 (recognizing that, although some stalking prosecutions may rely in whole or in part on words used by a defendant to establish the course of conduct and consequent effect upon the victim, *Counterman*'s requirement

to prove a subjective mens rea of recklessness only applies when the prosecution relies on the content of a defendant's expression as the basis for a stalking charge and to establish the victim's harm); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated . . . or carried out by means of language . . . .").

¶ 34　　As noted above, the court narrowed the stalking instruction to exclude any of Morris's communications to the victim. For this reason, had the court not granted Morris's motion for judgment of acquittal, the jury could have convicted Morris based on his conduct toward the victim but not on his communications to her. Yet the court concluded that its revision of the stalking instruction a few minutes earlier was insufficient to avoid a potential violation of Morris's First Amendment rights through a conviction based on words he uttered to the victim.

¶ 35　　The 1999 amendment to the stalking statute that added "approaches, contacts, or places under surveillance" to the types of conduct that can constitute stalking supports our conclusion. *See*

Ch. 215, sec. 1, § 18-9-111(4)(b)(I), 1999 Colo. Sess. Laws 792-94 (repealed and relocated to section 18-3-602, C.R.S. 2010, effective Aug. 11, 2010).  Before that amendment, the stalking statute addressed only situations where a person made a credible threat and, in connection with that threat, either repeatedly followed or made some form of communication with that person.  *People v. Burgandine*, 2020 COA 142, ¶ 24, 484 P.3d 739, 744; *see also People v. Miller*, 2024 COA 66, ¶ 46, 556 P.3d 1262, 1270.  In adding the "approaches, contacts, or places under surveillance" language, the General Assembly expanded the statute to cover additional types of stalking conduct.  *Burgandine*, ¶¶ 18, 24, 484 P.3d at 743-44 (noting that, by adding the subsection addressing emotional distress stalking and including both "contacts" and "any form of communication," the General Assembly intended to capture all stalking conduct by using such a broad term as "contacts," when arguably such word subsumed the "any form of communications" phrase already contained in the statute).

¶ 36    The case against Morris, as it went to the jury, was premised exclusively on his actions, not on the content of his communications to the victim.  By narrowing the stalking

instruction, the court ensured that Morris could not be convicted based on protected communications. At that stage of the trial, the stalking charge was solely premised on Morris's acts of banging on the door of the victim's studio, the volume of Morris's screams, and his attempts to force the victim to come to the door. The instruction the court provided the jury did not permit it to convict Morris of stalking for saying, "Will you talk to me?" "Can we talk?" and "Can I get my passcode back?" as he pounded on the door and yelled at the victim. Thus, the precise words Morris uttered to the victim were no more relevant to whether he stalked the victim than the defendant's utterance of "bang, bang" before shooting the victim was relevant to the first degree murder charge in *People v. Perez*, 2024 COA 94, ¶ 24, 559 P.3d 652, 658.

¶ 37 Accordingly, we conclude that the court erred by requiring the prosecution to prove the recklessness element contemplated in *Counterman* when seeking a conviction based on Morris's repeated contacts with the victim. Although the evidence elicited at trial included words that Morris spoke while engaging in the charged conduct, the instruction the court gave made clear that the stalking charge against Morris was not predicated on the content of his

communications. It was based solely on Morris's actions, not his words. As a result, the court should not have required the prosecution to prove that Morris consciously disregarded a substantial and unjustifiable risk that his repeated contacts with the victim would cause her harm.

### III. Disposition

We disapprove of the court's ruling.

JUDGE SULLIVAN and JUDGE TAUBMAN concur.